**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   No.  05-CR-56-TCK |
| | ) |
| **BOBBY WAYNE HALEY, JR.**, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Before the Court is Defendant's Motion to Suppress Introduction of Copy of Digital Surveillance Recording (Docket No. 56).  Defendant Bobby Wayne Haley Jr. ("Defendant") is charged with two counts of a three-count Indictment: Count One: Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. § 841(a)(1) and 841 (b)(1)(C), all in violation of 21 U.S.C. § 846; and Count Three: Distribution of Cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(C).  The digital surveillance recording that Defendant seeks to suppress forms the basis of the charges in Count Three of the Indictment.

On January 4, 2006, the Court held an evidentiary hearing on this matter.  The Court heard live testimony from Joe Martin ("Martin"), a computer technician hired by Defendant to analyze the digital surveillance recording at issue.  The Court also viewed the recording in its entirety.  The other evidence before the Court includes the Affidavit of Martin ("Martin Affidavit"), the Affidavit of Attila Mathe ("Mathe Affidavit"), the Supplemental Affidavit of Attila Mathe ("Mathe Supplemental Affidavit"), and the Affidavit of Piotr Wypych ("Wypych Affidavit").  Attila Mathe ("Mathe") is the President of Adaptive Digital Systems ("ADS"), the company that designed the

1

digital recording device and software used in this case.  Piotr Wypych ("Wypych") is a Development Engineer with ADS.

## I.      Factual Background

According to the Government, the recording at issue depicts a sale of approximately sixty-three grams of cocaine by Defendant to a confidential informant.  The transaction was captured by a concealed digital video recorder worn by the informant (the "Recording Device").  The Recording Device cost the Government approximately seven thousand dollars.  Based on the Mathe Affidavit and the Supplemental Mathe Affidavit, the following process occurs when images are captured on the Recording Device.  The Recording Device stores the digital video in a compressed format on an internal memory chip, which is embedded in the device and is referred to by Mathe as "embedded Flash memory."  After recording, the video captured by the Recording Device is then transferred by Government agents from the Recoding Device to "write-once" DVD media, using proprietary software specifically designed to transfer recordings from the Recording Device to a DVD or CD for playback.  Hereinafter, the Court will refer to the specific DVD to which the video recording in this case was transferred as "the DVD."  Both the Recording Device and the proprietary software used to transfer the images from the Recording Device to the DVD were produced exclusively for law-enforcement purposes by ADS.[1]

_____

[1]  With respect to the process, Mathe specifically stated as follows:

Each of ADS's covert digital devices records digital video and/or audio onto an internal Flash memory chip. . . . After recording, the digital video and/or audio is transferred using proprietary software to "write once" CD or DVD media. . . . Once the digital video is transferred from the recording device to the "write once" media, that media contains the "original" of the video for all intents and purposes. The original is created with write protection and therefore cannot be altered.  The recording device is then cleared and reconfigured to allow it to be used again.

At the hearing, the Court inquired whether the transfer process is capable of occurring only once or whether there could be multiple transfers from the Recording Device using the proprietary software.  Mathe submitted a supplement affidavit stating:

> After recording, the digital video and/or audio is transferred using proprietary software to "write once" CD or DVD media.  Although multiple copies of the digital video may theoretically be transferred from the recording device to media using this method, law enforcement agencies typically utilize protocols that require that the video be downloaded from the recording device only once, because this process creates the "original" of the video for all intents and purposes.  This original is created with write protection and therefore cannot be altered.  The recording device is then cleared and reconfigured to allow it to be used again.

(Mathe Supp. Aff. ¶ 4.)  Thus, the answer to the Court's question is that it is possible to make multiple downloads from the Recording Device but it is not the process typically employed.  The Mathe Supplemental Affidavit also explains the differences between the internal Flash memory utilized by the Recording Device and a "removable Compact Flash card," which is the type of memory chip that is typically used in a digital camera, in three significant ways: (1)  It may not be removed from the device under any circumstances.  (2) It cannot be played back, viewed, or altered using standard equipment.  It is specifically designed so that the video captured by the Recording Device may only be downloaded using proprietary ADS software and hardware.  (3) It is designed so that it may only be reused upon complete reformatting of the data memory, so that the there is no possibility that any earlier recording will remain.  In contrast, on a typical compact Flash card, it is possible for portions of a recording to "persist even when it has nominally been erased."  (*See* Mathe Supp. Aff. ¶ 3; *see also* Wypych Aff. ¶ 7 ("It is not possible to watch recorded video directly

_____

> There is no practical way to maintain the video on the recording device itself, because it would prevent the recording device from being used more than once.

(Mathe Aff. ¶¶ 4-6.)

from the digital video recorder used to make this video; rather, the video must be transferred to DVD media using proprietary ADS software in order to be viewed.").)

The Government seeks to introduce the DVD as evidence at trial.  The DVD was, for the reasons explained above, the only recording provided to Defendant for review before trial. Defendant moves to suppress introduction of the DVD, arguing that the Government is precluded from using the DVD because it does not constitute the "original" recording.  According to Defendant, the "original" is the "in real time" recording that was captured on the Recording Device and that was embedded in the internal Flash memory.  It is undisputed that the memory on the digital recorder was intentionally erased by the Government in order that the Recording Device could be reused.  Thus, Defendant argues that the Government intentionally destroyed the "original," rendering any "duplicate" inadmissible.  Defendant further argues that the DVD is not admissible as a duplicate because Defendant has raised a genuine question as to its authenticity, based on the testimony and affidavit of Martin, who concludes that there are jumps and inconsistencies on the recording that render it unreliable.

## II      Relevant Federal Rules of Evidence

Several evidentiary rules must be considered in determining whether to admit the DVD. Federal Rule of Evidence 1001 defines relevant terms as follows:

> (3) Original.  An "original" of a writing or recording is the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it.  An "original" of a photograph includes the negative or any print therefrom.  *If data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an "original."*

> (4) Duplicate.  A "duplicate" is a counterpart produced by the same impression as the original, or from the same matrix, by means of photography, including enlargements or miniatures, *or by mechanical or electronic re-recording,* or by chemical reproduction, *or by other equivalent techniques which accurately*

4

*reproduce the original*.

FED. R. EVID. 1001(3)-(4) (emphasis added).  Federal Rules of Evidence 1002 and 1003, governing

the use of "originals" and "duplicates," are as follows:

> Rule 1002 - Requirement of the Original
> To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.
>
> Rule 1003 - Admissibility of Duplicates
> A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

FED. R. EVID. 1002, 1003.

Federal Rule of Evidence 901 is also relevant to the analysis.  Rule 901 provides that "the

requirement of authentication as a condition precedent to admissibility is satisfied by evidence

sufficient to support a finding that the matter in question is what its proponent claims."  FED. R.

EVID. 901.  The Government relies on Rule 901, and Tenth Circuit cases referencing this rule, to

argue that the DVD is admissible because the Government will present evidence at trial that will

sufficiently authenticate the DVD.

## III.   Admissibility of Recording

First, the Court must determine whether the DVD at issue is an "original" or a "duplicate"

for purposes of the Federal Rules of Evidence.  The precise issue presented is not addressed by the

definitions or the examples provided in the rules, and the Court must therefore analogize the

technology at issue to the examples provided.  The technological process of transferring the images

to DVD from the Recording Device is explained above.  From the perspective of a defendant, the

process has the following practical results: (1) a surveillance recording cannot be viewed from the

5

Recording Device itself because the device is incapable of playback; (2) a recording may only be viewed by a defendant after a Government agent has downloaded the recording to a DVD or CD using software that is in the possession of the Government; (3) the internal memory of the Recording Device cannot be removed and provided to a defendant so that he may have his own technician transfer the recording to a viewable media; and (4) unless the Recording Device itself is preserved, at the cost of $7,000 per recording, a defendant cannot obtain the recording captured on the internal Flash memory. Therefore, the technological devices and processes chosen by the Government to record and produce surveillance evidence raise, at least at first blush, significant fairness concerns to a defendant. However, based on the technological safeguards that are in place and other evidence regarding the transfer process that is explained in detail below, the Court concludes that the DVD is admissible as an "original" recording. The Court alternatively concludes that the DVD is admissible as a "duplicate."[2]

A.    *The DVD is an "Original" Under FRE 1001(3)*

Crucial to the Court's decision regarding whether the DVD is an original or a duplicate is the testimony of ADS employees that the video surveillance cannot be viewed without transferring the video to a CD or DVD using conversion software. Based on this fact, the Court finds the technological circumstances presented by this case to be analogous to the following example in Rule 1001(3): "If data are stored in a computer or similar device, any printout or other output readable

_____

[2] Defendant does not dispute the accuracy of Mathe's description of the recording and transfer process. Defendant offers the testimony of Martin, but Martin merely raises concerns with whether the recording was tampered with, altered, or otherwise rendered unreliable in the transfer process. Martin, in fact, has little to no experience in dealing with digital recordings. For purposes of this motion to suppress only, the Court concludes that the process described in the Mathe Affidavits is an accurate description.

by sight, *shown to reflect the data accurately*, is an 'original.'" FED. R. EVID. 1001(3) (emphasis

added).  The evidence before the Court indicates that the digital recorder is only a recording and

storage device and that it cannot, under any circumstances, serve as a playback or viewing device.

If a piece of evidence is not ever capable of being viewed by the Court or the jury in its "original"

format, it seems illogical that it could be considered the "original" for evidentiary purposes at trial.

The Court concludes, therefore, that the Recording Device is akin to a computer or other similar

device for which there is no "output" until the recording is transferred to a DVD.  While there is a

"transfer" of sorts in that the captured images must be downloaded from the Recording Device to

a viewable media, the ensuing viewable media is more like a printout or other "output readable by

sight" described in Rule 1001(3) than a "re-recording" described in the definition of duplicate in

Rule 1001(4).

   The second and perhaps more important question is whether the "output" from the Recording

Device (in this case the DVD) is shown to "reflect the data accurately." FED. R. EVID. 1001(3).  The

Government has presented evidence that substantial safeguards are taken during the transfer process

that convince the Court that the DVD reflects the data accurately.  Specifically, Mathe stated as

follows:

> Each of ADS's covert digital devices records digital video and/or audio onto an
> internal Flash memory chip.  The video and audio data is recorded in separate 1048
> byte blocks that are time and date stamped.  Video frames are numbered and tagged
> from which camera they come from.  All data in a block, including the time stamp,
> is protected with Cyclic Redundancy Check (hereinafter CRC), which protects the
> data integrity by alerting the user if the data is altered, either intentionally or
> inadvertently.  CRC algorithms are widely used in the computer industry to assure
> integrity of data transmission.
>
> After recording, the digital video and/or audio is transferred using "write once" CD
> or DVD media.  During the transfer of data from recorder or "write once" CD or
> DVD media, CRC algorithm is run for each block of data and the result for the

transferred data is compared to the CRC result for the digital video contained on the flash memory chip and verified. Should an error occur during the transfer of a block, that block is re-transferred and re-verified.

. . .

When the video has been transferred to the "write once" digital media, it may be copied onto additional media, and it may be played back from either the original or subsequent copies. The data is also verified via the CRC algorithm during playback. If the calculated CRC values differ from the values stored in the media, an error message is displayed. This assures that the video being played back is identical to that originally recorded.

(Mathe Aff. ¶¶ 4, 5, 7.)  This process and these safeguards were not disputed in these proceedings. Further, it appears to the Court that specific and measured steps are taken to ensure accuracy during the transfer or "output" process. These safeguards satisfy the Court that the images on the DVD are transferred from the Recording Device in a manner that minimizes the possibility that the images are altered, either intentionally or accidentally, during the transfer process. Like a traditional "print out" from a computer or other "output readable by sight," it seems that the transfer to DVD involves very little chance for alterations, tampering, or error.  Unlike a "re-recording" that involves significant opportunity for deletion, changes, or interruptions during the transfer process, the transfer process here is completed in such a manner that an "error" message is displayed if there any changes from the values stored in the Recording Device.  Thus, the technology used is expressly designed to minimize the possibility of alteration from the original.  It is not a situation, therefore, where a Government agent transferring the recording has an opportunity to delete, re-order, or change the recorded images.

Without these safeguards, the Court would have significant difficulty with the issue presented.  Although the Court concludes that the DVD is an original for evidentiary purposes, it must be considered that the Government has chosen to use a recording device that is incapable of

8

producing an "original" without some type of conversion process, which is typically completed by Government agents.  Obviously, a more desirable device for criminal justice purposes would be a device with a removable memory chip, such that a defendant could have its own technician view and/or download the image in addition to the process completed by the Government.  However, the Recording Device and accompanying software at issue in this case were designed to minimize, rather than to allow, alterations or tampering in the transfer process, and the Court is convinced that the Government has met its burden of showing that the DVD accurately reflects the data contained in the Recording Device.

Therefore, the Court holds that the DVD in this case, which contains the one recording that was directly downloaded from the Recording Device, constitutes the "original" recording for evidentiary purposes.[3]  All subsequent copies made of this "original" DVD, which are not made using the software containing safeguards and would therefore be "re-recorded" in a more traditional sense, are "duplicates" for evidentiary purposes.[4]  Of course, the Government must still present

_____

[3] It is problematic that the transfer process can occur more than once.  Theoretically, there could be more than one version that was directly downloaded from the DVD and therefore more than one "original."  However, in this case, there was only one "original" because the transfer process only occurred once.  The Court admonishes the Government that making more than one transfer from this type of recording device could change the analysis in future cases of whether a DVD in fact constitutes an "original" in a given case for evidentiary purposes.

[4] The Court found no case holding that a visual recording that has been transferred from a digital recording device to a CD or DVD is an "original" under the evidence rules.  In *United States v. Balzano*, 687 F.2d 6 (1st Cir. 1982), the court addressed the admissibility of a tape made from a "Nigra" recorder worn by an informant that had no capacity for audio replay. Without discussion, the court assumed that the copy was a duplicate and analyzed the admissibility accordingly.  *Id.* at 7.  In *United States v. Capanelli*, 257 F. Supp. 2d 678, 680 (S.D.N.Y. 2003), the court held that voice recordings that had been transferred from a digital recording device to a CD or audiotape were admissible as "duplicates."  The court stated: "The government intends to offer at trial CD or tape reproductions of the destroyed digital chip original recordings.  Such reproductions would appear to qualify as duplicates under Rule

9

testimony at trial to authenticate the DVD under Rule 901, and Defendant may still challenge the weight to be afforded the recording by pointing out the alleged inconsistencies and jumps detected by Defendant's computer technician.

      B.      *Alternatively, the DVD is Admissible as a Duplicate Under FRE 1003*

      Alternatively, the Court assumes, as Defendant argues, that the DVD is a "duplicate." Even assuming the DVD is a "duplicate," the Court finds it is admissible as a duplicate because there is not a genuine question raised as to the authenticity of the original and because it would not be unfair to admit the duplicate in lieu of the original.  *See* FED. R. EVID. 1003; *see also United States v. Georgalis*, 631 F.2d 1199, 1205 (5th Cir. 1980) (party seeking suppression of evidence must meet burden of showing that there is a genuine issue as to the authenticity of the unintroduced original or as to the trustworthiness of the duplicate, or as to the fairness of substituting the duplicates for the original).  Defendant does not question the authenticity of the recording on the Recording Device but instead questions whether there were alterations or tampering during the transfer process that resulted in an unreliable duplicate, such that it is unfair to admit the DVD.[5]  Defendant further

_____

1001(4)."  This holding was affirmed by the Court of Appeals for the Second Circuit.  *See United States v. Savarese*, 404 F.3d 651, 656 (2d Cir. 2005) (finding that the recordings were duplicates because the term "duplicate" includes an "electronic re-recording").  However, neither the district court nor the Second Circuit mentioned or considered whether the "original" recordings on the digital chip were capable of playback and did not cite any evidentiary record regarding the technical aspects of the so-called "originals."  The Court disagrees with *Capanelli*, *Savarese,* and *Balzano* to the extent they hold that the transferred recordings are "duplicates" rather than "originals," where the so-called "original" would be incapable of being viewed by a jury even if it were available.

    [5]  Although Defendant argues this point under Rule 1003, the Court notes that Defendant's argument that the DVD is unreliable because of the possibility of alteration in the transfer process could also form the basis of an argument that the DVD does not fit the definition of "duplicate" in Rule 1001(4).  By definition, a "duplicate" must accurately reproduce the original.  FED. R. EVID. 1001(4); *see also* FED. R. EVID. 1003 adv. comm. n. (noting that a

argues that, because the recording on the internal Flash memory was intentionally destroyed by the government for the purpose of reusing the device, the government must be precluded from using the duplicate, relying primarily on the case of *People v. King*, 225 P.2d 950 (Cal. App. 1951).

First, as explained in detail above, the Court concludes that the Government has presented evidence that substantial safeguards are taken during the transfer process that minimize concerns regarding the trustworthiness of the duplicate or the unfairness of admission of the duplicate. Again, these safeguards satisfy the Court that the images on the DVD are transferred from the digital device in a manner that assuages any concerns regarding the images being altered, either intentionally or accidentally, during the transfer process. This case can be contrasted with cases in which the transfer to the "duplicate" involves an opportunity to delete, alter, or otherwise render unreliable the "original," such as a traditional re-recording of an audio or video tape. Instead, it is a case in which the duplicate has been created via software that is expressly designed to prevent alteration from the original using CRC algorithms.

Second, Martin raises the following concerns with the recording:

The recording was made at 30 frames per second. I found two inconsistencies with this continuous 30 frames per second recording. At one point, approximately four minutes into the tape, the recording image jumped some ten feet. Not long after this

---

counterpart serves equally well as the original, if the counterpart is the product of a method which insures accuracy and genuineness and that a "duplicate" possesses such character by definition). For the same reasons that the Court concludes admission of the DVD in lieu of the digital recording is not untrustworthy or unfair under the circumstances, the Court concludes that the transfer process is a method which insures accuracy and genuineness, such that the DVD qualifies for the definition of "duplicate" under Rule 1001(4). *Cf. United States v. Seifert*, 351 F. Supp. 2d 926, 928 (D. Minn. 2005) (finding that government had laid an adequate foundation that a duplicate accurately depicted the original where the image transfer – from analog to digital format – changed the image only "in a metaphysical sense" and had no effect on the accuracy of the image, but where court had opportunity to view "before" and "after" images to insure accuracy).

jump, there appears to be a transfer of a plastic baggie with white-colored contents inside a car possibly being transferred to someone standing outside the car. After the transfer, the recording freezes on a wall for approximately half a second. The existence of these two places where continuity in the tape appears to be interrupted, particularly right before and after apparent illegal activity, in my opinion creates an issue about the reliability of the recording. The best way to resolve this issue is to review the original in real time recording.

(Martin Aff. ¶2.)

With respect to concerns raised by Defendant regarding jumps and inconsistencies in the recording, Mathe stated:

The nature of these covert video recorders is such that a small amount of movement can create large changes in camera view and lighting. These movements result in a 'jerky' playback, and cause some frames to appear unfocused or smudged. The same movements account for sudden changes in picture brightness with the camera continuously trying to adjust to changing light and scenery.

(*Id.*) Wypych, another ADS employee, specifically analyzed the recording and converted the recording to individual frames. He stated:

Of the 15,173 total frames, 78 (one half of one percent) are incomplete and marked with an "x." These frames have some sections missing, ranging from a tiny segment to a frame that cannot be decoded at all. The 78 incomplete or missing frames are scattered sporadically throughout the video. These sporadic missing or incomplete frames are not unusual, and typically occur when the picture compression engine is faced with rapidly changing scenery and/or lighting conditions. The creation of incomplete or missing frames occurs during the digital recording process, and these incomplete or missing frames persist when the digital video is transferred from the recorder to the DVD media. The presence of incomplete or missing frames in no way affects the reliability of the video, and I found nothing in the course of my analysis of the video to suggest that the video had been tampered with or altered in any way.

(Wypych Aff. ¶ 4-6.)

This testimony of Mathe and Wypych persuades the Court that the jumps and inconsistencies, in and of themselves, do not render introduction of the duplicate in this case fundamentally unfair. The Government has a proffered explanation for any inconsistencies

12

(instability in the recording process), which Defendant is free to counter with its own explanation (tampering or alteration in the transfer process). Therefore, the Court concludes that any of Defendant's concerns based on the inconsistencies of the recording go to the weight to be afforded the recording and not to its admissibility as a duplicate. *See Capanelli*, 257 F. Supp. 2d at 680 (noting general rule that any doubts raised by a challenge to the reliability of a duplicate recording would "go to the weight to be given to the tapes by the jury, not to their admissibility"). The court in *Capanelli* specifically found as follows:

> Most of defense counsel's submissions in the recent correspondence go to the reliability of the recordings, with a particular emphasis upon complications that might arise from modern recording and reproducing technology. This is an area that defense counsel may probe through cross-examination of the government's witnesses and the opinion testimony of a defense expert witness, with the reliability of the recordings being left . . . to the jury.

*Id.* at 681.[6]

Third, the Government intends to produce witnesses at trial that appear to be able to sufficiently authenticate the recording pursuant to Federal Rule of Evidence 901. The Government contends it will offer testimony of agents who operated the digital recording equipment, agents who were conducting surveillance during the transaction, and the confidential informant who participated in the recorded drug transaction in order to authenticate the recording. This evidence is typically sufficient for authentication under Rule 901 in cases involving recorded evidence. *See United States v. Mills*, 194 F.3d 1108, 1112 (10th Cir. 1999) (video tape properly admitted into

---

[6] The Court was initially quite concerned about the "interruptions" before and after the illegal activity described by Martin in his Affidavit; however, after viewing the recording and hearing Martin's testimony at the hearing, the Court is not convinced that these "interruptions" even exist on the tape. Nonetheless, the weight to be afforded the recording is a question for the jury.

evidence because officer responsible for filming the escort testified as to the authenticity of the tape and deletion of certain portions of tape did not "affect the accuracy of the remaining images"); *United States v. McIntyre*, 836 F.2d 467, 470 (10th Cir. 19870 (audio tape admissible where a witness "who heard the statement also testifies and the recording gives independent support to his testimony"); *United States v. Savarese*, 404 F.3d 651, 657 (2d Cir. 2005) (district court did not abuse discretion in admitting digital recordings where government's testimonial evidence was sufficient to support a finding of authentication under Rule 901). The Government intends to offer witnesses, including the confidential informant himself, who will be able to authenticate the recording of the transaction by describing, *inter alia*, whether the recording actually depicts the events in which the informant was involved and whether the individual on the tape is Defendant. Due to the safeguards in the recording process, the typicality of "jumps" or inconsistencies during the process of recording on to the Recording Device, and the authentication evidence that will be offered by the government pursuant to Rule 901, the Court finds that, even if the DVD is not an original, the DVD would be admissible as a duplicate under Rule 1003.

Finally, the Court finds that Defendant's cited case of *People v. King*, 225 P.2d 950 (Cal. App. 1951), and other similar authority, are not persuasive in regard to the technology at issue.[7] In *King*, conversations between two defendants in a cell were recorded by an audio recording machine onto four tapes, each of which were thirty minutes long. *Id.* at 953. These four tape recordings were "transcribed" on "two 16-inch discs, so that each side of each disc has on it all that was on one tape;

---

[7] The *King* case need only be addressed if the DVD is considered a "duplicate." This Court obviously finds this case distinguishable on grounds that it views the DVD at issue in this case as the "original." Because the Court offers an alternative holding that the DVD is admissible as a duplicate, however, the Court finds it appropriate to address the holding in *King*.

he transcribed the tapes by 'plying' each tape back on the original machine that it was made on and by fitting it into the disc recorder." *Id.* The court stated that "the transcription is a mechanical operation which transforms one to the other exactly, and he did not put any sounds on the disc that were not on the tape and he did not omit from the disc anything that was already recorded on the tape." *Id.* After this process, the original tapes were returned to stock and taped over. The court concluded that the "original tape recordings were destroyed intentionally. The disc recordings were secondary evidence and, under the circumstances here, they should not have been received in evidence." *Id.*

This case is distinguishable in important respects. First, recent Tenth Circuit law cited above and cited by the Government in their brief indicates that admission of a duplicate is proper where the duplicate can be authenticated under Rule 901. The Tenth Circuit has so held even where a video tape offered as evidence contained deletions from the original recording. *See Mills*, 194 F.3d at 1112 (video tape properly admitted into evidence based on authentication even where portion of tape had been recorded over because the deletion "did not affect the accuracy of the remaining images"). Thus, to the extent *King* reflects a strict rule that a duplicate is inadmissible even where the duplicate is identical to the original and even where the duplicate can be authenticated, this seems to be inconsistent with current Tenth Circuit law and perhaps even the Federal Rules of Evidence, which expressly allow admission of a "re-recording" as a duplicate so long as admission is fair under the circumstances. Second, with respect to the "intentional destruction" issue, which appears to be the focus of Defendant's argument, the Court finds that requiring the Government to preserve a recording on a digital recording device that cost seven thousand dollars, such that it can be used only once, is quite different than requiring the government

15

to preserve audio tapes.  Due to the increased cost of technology used for surveillance recording, the Court is unwilling to adopt a categorical rule that the Government must preserve recordings where such a rule would render costly equipment available only for one-time use.   Further, there is no evidence here that the originals were lost or destroyed "in bad faith."  *See* FED. R. EVID. 1004; *Balzano*, 687 F.2d at 8 (even where tape was deliberately erased, there was no allegation that tape was destroyed in bad faith).  In short, the cases cited by Defendant are simply not persuasive in relation to the modern technological issues presented here.

**IV.**     **Examination of the Recording Device**

Defendant first requested that he be permitted to examine the "original in real time recording" of the surveillance activity as well as the device used in creating the recording.  (*See* 9/21/05 Letter, Def.'s Ex. 2.)  In a follow-up letter, after being informed that the memory chip had been "blanked out" by the Government, Defendant's counsel requested to examine the chip itself and the recording device itself to ensure there was no remaining data with evidentiary value.  Counsel acknowledged the Government's objection to production of the equipment used in the surveillance.  (*See* 9/26/05 Letter, Def's Ex. 1.)

The Government's objection is based on its qualified privilege to protect sensitive investigative techniques, such as the nature of electronic surveillance equipment.  *See, e.g., United States v. Cintolo*, 818 F.2d 980, 1002-03 (1st Cir. 1987) (recognizing privilege to protect location of electronic surveillance devices); *United States v. Van Horn*, 789 F.2d 1492, 1507-08 (11th Cir. 1986) (stating that the privilege applies equally to the "nature and location of electronic surveillance equipment").  This privilege is recognized due to concerns that disclosure of this type of information will enable criminals to frustrate future government surveillance and unduly jeopardize the security

16

of ongoing investigations. *Cintolo*, 818 F.2d at 1002. The Court concludes that the qualified privilege applies in this case. Production of the Recording Device and public disclosure of information regarding placement and use of the device could jeopardize criminal investigations by enhancing the ability of criminal enterprises to employ counter-surveillance tactics, such as physical searches and electronic sweeping. It is therefore analogous to the "sensitive investigative techniques" at issue in *Cintolo* and *Van Horn*.

To overcome assertion of this qualified privilege, a defendant must make a sufficient showing of need. *Id.* The necessity determination requires a case-by-case balancing process that is controlled by "fundamental requirements of fairness." *Id.* "A key to evaluating this claim of necessity, however, is the extent to which adequate alternative means could have substituted for the proffered [evidence]." *Id.* (concluding that disclosure of location of surveillance equipment would have contributed no meaningful evidence to defense). In the context of the location of a police surveillance post, one court has similarly held that a defendant must show that "he needs the evidence to conduct his defense and that there are no alternative means of getting at the same point." *United States v. Harley*, 682 F.2d 1018, 1020 (D.C. Cir. 1982). Ultimately, a court must balance the "degree of the handicap" that a defendant establishes against the "policies underlying the privilege." *Id.*

At the hearing held on January 4, 2006, the Court ordered Defendant to file a supplemental brief responding to the Government's assertion of privilege under *Cintolo* and outlining its "need" to examine the equipment. In his brief, Defendant asserts that without accessing and testing the device itself, there is no way for Defendant to: (1) verify Mathe's assertion that the recording on the chip can only be transferred from the chip on to the "write once" media; (2) verify the capacity

of the recording chip and whether there is actually a need to erase it; (3) verify that one cannot access or view the original recording; (4) verify that the "jumps" that occurred were present in the original; (5) verify that the only way to record on to the chip is through the camera in which the chip is embedded; and (6) verify the block times or camera tags asserted.  In short, according to Defendant, without the equipment, a defendant has no effective alternative means to verify the representations regarding the nature and use of the equipment. (*See* Def.'s Br. Regarding Inspection of Surveillance Equipment at 4-6.)

The Government argues in response that Defendant's stated needs are similar to those asserted in *Cintolo*, *Van Horn*, and *Harley* in which courts held that the defendant had "ample alternative means" to develop the evidence based on evidence already provided by the Government. In *Van Horn*, the defendants argued that information regarding the type of microphone used and where the microphone was hidden in a defendant's office was necessary to allow defendant to demonstrate that the voices on an audio tape could have been distorted, resulting in improper voice identifications.  The district court conducted an *in camera* hearing and concluded that defendants had not shown the requisite necessity.  *Van Horn*, 789 F.2d at 1508.  The appellate court affirmed, explaining:

> There was testimony that the voices *could* have been distorted by the way the microphone was hidden. The district court, however, listened to Agent Copus, who was monitored from Harvey's office during the course of the investigation and was able to compare Agent Copus' voice on the tapes with his actual voice and determine that the voice had been accurately recorded. The appellants were allowed to examine the tapes, and were informed that the transmission was by air rather than wire. The ultimate question of whether the voice identifications of the appellants were correct was given to the jury and the appellants were allowed to explore and argue the possibility of misidentification in front of the jury. Accordingly, we agree with the district court's finding that necessity was not shown in this case.

18

*Id. See also Harley*, 682 F.2d at 1020 (defendant did not show a need to know the precise floor of a cooperating civilian's apartment that would outweigh the safety of the cooperating apartment owner); *Cintolo*, 818 F.2d at 1002-03 (defendant did not show a need to ask questions regarding the precise location of electronic surveillance devices to support contention that persons inside the apartment were not in position to hear certain statements where jury heard other evidence, such as the size of the room, that could establish that fact and where defendant had access to premises and floor plan for inspection prior to trial).

The Court concludes that the handicap faced by Defendant in not examining the recording equipment in this case is, to some extent, more significant than the handicap faced by the defendants in the Government's cited cases. This case presents a unique situation in that the most effective way for Defendant to determine if the recording and downloading process described by Mathe in his Affidavits is accurate is to examine the requested equipment. Further, the Government has chosen to develop and utilize equipment that raises certain inherent fairness concerns to a defendant, including the equipment's inability to playback the recording, to retain the first recording without significant expense, and to allow removal of a memory chip from which a defendant could download the recording himself. In this situation, where Defendant has only been provided with the downloaded version, the Court cannot determine what "alternative means" are available to develop and proffer evidence that the jumps or inconsistencies in the recording did not occur upon the first recording but instead occurred in the downloading process completed by the Government agent. Although, for the reasons explained above, the Court is convinced that there are safeguards in place during the downloading process that render the evidence sufficiently accurate to be *admissible* as an original or a duplicate for evidentiary purposes, this does not mean a defendant should be

deprived of the opportunity to develop evidence that would *convince a jury* that the downloading process described by the Government does, in fact, have certain flaws or that the statements by the Government's technicians regarding the downloading process are incomplete or inaccurate. Therefore, Defendant has made at least an initial showing of "need" for examination of the evidence.

However, the Court is also mindful of the Government's compelling interest in protecting the secrecy of its surveillance equipment. Therefore, the Court concludes that the most prudent method of examining the relevant evidence in this case is for the Court to conduct its own *in camera* examination of the evidence and make a determination as to whether it is necessary to turn the evidence over to Defendant. Because the Court cannot meaningfully examine the equipment or the DVD without technical assistance, the Court will appoint its own "technical adviser" to examine the DVD and the equipment at issue to determine if the Government's technicians have accurately described the process and to determine if the independent examiner has any concerns regarding alterations or tampering with the DVD in this particular case. Such adviser is appointed pursuant to the Court's common law authority to "appoint an expert as a technical adviser to assist the judge in understanding the issues in a case." *See* 29 Charles Alan Wright and Victor James Gold, *Federal Practice and Procedure: Evidence* § 6303 (1997); *Reilly v. United States*, 863 F.2d 149, 154-55 & n.4 (1st Cir. 1988) (affirming district court's conclusion that such power "inheres generally" in a district court).[8] The appointed adviser shall examine the equipment and DVD and submit an *in camera* report to the Court regarding his or her findings. If the Court is convinced, after receiving

---

[8] This adviser will not serve as a testifying court-appointed expert pursuant to Federal Rule of Evidence 706, and the requirements of Rule 706 therefore do not apply. *See* 29 Charles Alan Wright and Victor James Gold, *Federal Practice and Procedure: Evidence* § 6303 (1997) ("The role of the technical advisor is to give advice or other assistance to the judge, not to testify. Accordingly, Rule 706 is inapplicable to such experts.").

the report of such independent examiner, that Defendant may benefit in some way from examination

of the equipment at issue, the Court will then consider whether and under what conditions to order

the Government to produce the equipment to Defendant.  For the reasons explained above regarding

the Government's choice to utilize a surveillance device that raises certain fairness concerns and

because the Court's *in camera* review is being conducted to protect the Government's  interests, the

Court finds that it is appropriate for the Government to bear the cost of this technical adviser.

## V.    Conclusion

It is therefore ORDERED that Defendant's Motion to Suppress Introduction of Copy of

Digital Surveillance Recording (Docket No. 56) is DENIED.  The parties are ORDERED to agree

and to submit to the Court the name of an independent examiner who is not an employee of ADS

and who is not associated with the Government but who is qualified to examine the equipment and

DVD at issue.  The parties are ORDERED to agree and to submit to the Court a Confidentiality and

Protective Order for the examiner to sign that will govern and limit the use of any information he

discovers in the course of examining the equipment and the DVD.   The parties are also ORDERED

to state whether they object to any aspect of the above-outlined procedure governing the Court's examination.  These submissions shall be provided to the Court no later than February 23, 2006.

IT IS SO ORDERED this 16th day of February, 2006.

TERENCE KERN
United States District Judge